# 13-3416-CV

## UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

SOMPO JAPAN INSURANCE COMPANY OF AMERICA,
*Plaintiff – Appellant,*

SOMPO JAPAN INSURANCE, INC.
*Plaintiff*

v.

NORFOLK SOUTHERN RAILWAY COMPANY, NORFOLK SOUTHERN
CORPORATION, THE KANSAS CITY SOUTHERN RAILWAY COMPANY,
*Defendants – Appellees*

## DEFENDANTS – APPELLEES' RESPONSE BRIEF

Paul D. Keenan
KEENAN COHEN & HOWARD, P.C.
165 Township Line Road
One Pitcairn Place, Suite 2400
Jenkintown, PA 19046
Telephone: (215) 609-1110
E-Mail: pkeenan@freightlaw.net
Attorneys for Defendants - Appellees

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Norfolk Southern Railway Company ("Norfolk Southern") is a wholly owned subsidiary of Norfolk Southern Corporation ("NSC"). NSC is a publicly held corporation that holds 10% or more of Norfolk Southern's stock. Norfolk Southern and NSC are non-government corporations.

Kansas City Southern Railway Company ("KCSR") is a wholly owned subsidiary of Kansas City Southern ("KCS"). KCS is a publicly held corporation that holds 10% or more of KCSR's stock. KCSR and KCS are non-government corporations.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .........................................i

TABLE OF CONTENTS.................................................................... ii

TABLE OF AUTHORITIES .............................................................v

I.    COUNTER--STATEMENT OF ISSUES PRESENTED FOR
      REVIEW ...........................................................................1

II.   COUNTER--STATEMENT OF THE CASE....................................2

III.  COUNTER--STATEMENT OF THE FACTS ................................7

      A.    The Parties ...............................................................7

      B.    The Shipments at Issue..............................................8

      C.    The Bills of Lading Governing the Shipments ...................9

            1.    The Yang Ming Bill of Lading ...............................9

            2.    The Nippon Express Bill of Lading .........................11

            3.    The Norfolk Southern-Yang Ming Intermodal
                  Transportation Agreement ....................................12

IV.   SUMMARY OF THE ARGUMENT .........................................12

      A.    Sompo's "Waiver" Arguments are Meritless.....................12

      B.    The "Covenant Not to Sue" in the Yang Ming Bill of Lading
            Is Unambiguous and, Therefore, Enforceable Against Sompo..........14

      C.    Application of the Supreme Court's Decision in Kirby
            Renders Consideration of Any Ambiguity in the Nippon
            Express Bill of Lading Moot ...............................14

      D.    Application of the Package Limitation of Liability Caps Any
            Recovery For Damage to the Unisia Shipment to $37,000.................16

V.    ARGUMENT...................................................................17

      A.    Sompo's "Waiver" Arguments are Meritless.....................17

1.  This Court's Remand Order Required the District Court to Consider Sompo's Common Law Contract Claim and the Railroads' Defenses Thereto ............................17

    a.  "History" of the Common Law Claims In This Case.................................................................................17

    b.  The District Court's Consideration of the Railroads' Contract Defenses Was Consistent With the Express Terms of the Remand Order .............21

2.  The Railroads Did Not Waive Their Covenant Not to Sue Defense.........................................................................24

    a.  The Railroads Raised Their Defense When It Was Pragmatic to Do So...................................25

    b.  The Assertion of the Covenant Not to Sue Defense Was Appropriately Raised at the Summary Judgment Stage of This Litigation.................31

    c.  Sompo Has Not Suffered Any Prejudice Resulting From the Railroads' Assertion of the Covenant Not to Sue Defense at the Summary Judgment Stage ...............................................32

B.  The "Covenants Not to Sue" in the Yang Ming and Nippon Express Bills of Lading Are Enforceable Against Sompo.................37

    1.  The "Covenants Not to Sue" Are Not "Exoneration Clauses." ................................................................37

    2.  The Covenant Not to Sue in the Yang Ming Bill of Lading Unambiguously Protects the Railroads From Suit Initiated by the Shippers or Their Insurers to Recover for Damage to Freight...................................42

    3.  The Supreme Court's Decision in Kirby Renders Consideration of the Ambiguity in the Nippon Express Bill of Lading Moot ...............................................47

C.  Recovery of Damages for the Unisia Shipment is Limited to $37,000.........................................................................52

    1.  Relevant Facts ..........................................................53

iii

2.    Applicable Law ........................................................54

3.    The Unisia Shipment Involved 74 Packages ...........................56

VI.    CONCLUSION............................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allianz CP Gen. Ins. Co. v. Blue Anchor Line*,
  2004 U.S. Dist. LEXIS 8175, 2004 WL 1048228
  (S.D.N.Y. May 7, 2004) .................................................................40

*Allied Int'l American Eagle Trading Corp. v. S.S. Yang Ming, et al.*,
  672 F.2d 1055 (2d Cir. 1982) ......................................................55

*Aluminios Pozuelo, Ltd. v. SS. Navigator, et al.*,
  407 F.2d 152 (2d Cir. 1968) ........................................................55

*Binladen BSB Landscaping v. M.V. Nedlloyd Rotterdam*,
  759 F.2d 1006 (2d Cir. 1985) ......................................................56

*Blonder-Tongue Lab. v. University of Ill. Found.*,
  402 U.S. 313 (1971)......................................................................32

*Erwin v. S. Regency Tennis Ctr. LLC*,
  2010 U.S. Dist. LEXIS 54100 (S.D. Ohio May 11, 2010)............32

*Fed. Ins. Co. v. Union Pac. R.R*,
  651 F.3d 1175 (9th Cir. Cal. 2011) .............................................40

*Ginett v. Computer Task Croup, Inc.*,
  11 F.3d 359 (2d Cir. 1993) ..........................................................21

*Groupe Chegaray v. De Chalus. v. P & O Containers*,
  251 F.3d 1359 (11th Cir. 2001) ...................................................55

*Hartford Fire Ins. Co. v. Orient Overseas Container Lines, Ltd.*,
  230 F.3d 549 (2d Cir. 2000) ..................................................44, 46

*In re Coudert Bros. LLP*,
  2013 Bankr. LEXIS 3360 (Bankr. S.D.N.Y. Aug. 19, 2013)................. 22-23

*Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*,
  __ U.S. __, 130 S. Ct. 2433 (2010) .......................................*passim*

*Klicker v. Northwest Airlines, Inc.*,
  563 F.2d 1310 (9th Cir. 1977) .....................................................41

v

*Locafrance U.S. Corp. v. Intermodal Systems Leasing Inc.*,
    558 F.2d 1113 (2d. Cir. 1977) ........................................................32

*Ltd. Brands, Inc. v. F.C. (Flying Cargo) Int'l Transp. Ltd.*,
    2006 U.S. Dist. LEXIS 17029 (S.D. Ohio Mar. 27, 2006) ....................39, 40

*Lucky-Goldstar Intern. (America), Inc. v. S.S. California Mercury*,
    750 F. Supp. 141 (S.D.N.Y. 1990) ........................................................45, 46

*Mattel, Inc. v. BNSF Ry. Co.*,
    2011 U.S. Dist. LEXIS 495, 2011 WL 90164
    (C.D. Cal. Jan. 3, 2011) ........................................................40

*Mo. Pac. R.R.Co. v. Elmore & Stahl*,
    377 U.S. 134, 84 S. Ct. 1142 (1964) ........................................27

*Nader v. Blair*,
    549 F.3d 953 (4th Cir. 2008) ........................................................35

*Nipponkoa Ins. Co., LTD v. Norfolk S. Ry. Co.*,
    794 F. Supp. 2d 838 (S.D. Ohio 2011) ........................................32, 39, 40

*Norfolk Southern Railway Co. v. Kirby*,
    543 U.S. 14 (2004) ........................................................*passim*

*Project Hope v. M/V. IBN Sina*,
    250 F.3d 67 (2d Cir. 2001) ........................................................18

*Rose v. AmSouth Bank of Florida*,
    391 F.3d 63 (2d Cir. 2004) ........................................................24

*Royal & Sun Alliance Insur. PLC v. Ocean World Lines, Inc.*,
    572 F. Supp. 2d 379 (S.D.N.Y. 2008), *aff'd*, 612 F.3d 138
    (2d Cir. 2010) ........................................................15, 48, 50, 51

*Saks v. Franklin Covey, Co.*,
    316 F.3d 337 (2d Cir. 2003) ........................................................24, 33

*Santa Fe P. & P.R. Co. v. Grant Bros. Construction Co.*,
    228 U.S. 177, 33 S. Ct. 474, 57 L. Ed. 787 (1913) ........................41

*Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Com.*,
    712 F.2d 740 (2d Cir. 1983) ........................................................41

*Sompo Japan Ins. Co. of America v. Union Pacific R. Co.*,
    456 F.3d 54 (2d Cir. 2006) ........................................................4, 18

*St. Paul Travelers Ins. Co. v. M/V Madame Butterfly*,
   700 F. Supp. 2d 496 (S.D.N.Y. 2010)
   *aff'd on other grounds* 433 Fed. Appx. 19 (2d Cir. N.Y. 2011) ...................40

*Standard Electrica, S.A. v. Hamburg Sudamericanische*,
   375 F.2d 943 (2d Cir. 1967) ........................................................................55

*Toyomenka, Inc. v. S.S. Tosaharu Maru*,
   523 F.2d 518 (2d Cir. 1975) ...................................................................45, 46

## Statutes & Other Authorities:

49 U.S.C. § 10709 ...........................................................................................19, 26

49 U.S.C. § 11706 .............................................................................................2, 17

Fed. R. Civ. P. 56(d)(2) .........................................................................................35

Fed. R. Civ. P. 8(c) ...........................................................................................31, 32

2-8 MOORE'S FEDERAL PRACTICE - CIVIL § 8.08(5) ..............................................32

## I.     COUNTER--STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.     Whether the District Court's consideration of plaintiff-appellant's ("Sompo") common law and breach of contract claims, and the defendant-appellees' ("the Railroads") defenses thereto, were beyond the scope of this Court's remand of those claims.

2.     Whether the Railroads were obligated to pursue their "covenant not to sue" defense to Sompo's common law and breach of contract claims prior to this Court's remand of those claims, even though Sompo's common law and breach of contract claims were not part of this case because they had been dismissed.

3.     Whether the District Court erred when it construed the Yang Ming Bill of Lading in such a manner as to render all of its provisions to be meaningful.

4.     Whether the District Court erred when it applied the United States Supreme Court's holding from *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004) and held that its application to this case rendered any ambiguity in the Nippon Express Bill of Lading moot.

5.     Whether the District Court erred when it held that the covenant precluding suit was not an unenforceable exoneration clause, because the Railroads could still be held liable to the proper party for damage to the freight at issue, and because Sompo and its insureds still had a remedy for their losses against the proper party.

## II.    COUNTER--STATEMENT OF THE CASE

In its Complaint, plaintiff-appellant, Sompo Japan Insurance Company of America, Inc. ("Sompo"), asserted freight loss claims against defendant-appellees, Norfolk Southern Railway Company and Kansas City Southern Railway Company (collectively, "the Railroads"), based on the following alternative legal theories: (1) liability as a rail carrier under 49 U.S.C. § 11706 ("the Carmack Amendment"); (2) breach of contract; (3) negligence; and (4) breach of bailment obligations. (Sompo's claims for breach of contract, negligence and breach of bailment obligations are hereinafter referred to as "the Common Law Claims".)

After the pleadings closed, Sompo moved the District Court for partial summary judgment on the limitation of liability defenses asserted by the Railroads. In its motion, Sompo argued that its claims were governed exclusively by the Carmack Amendment, and that, because the Railroads had not offered Sompo's insureds "full Carmack liability coverage", the Railroads could not invoke various limitations of liability contained in other shipping agreements relevant to the insureds' freight.  (A62 – A63; *see also* Sompo's Brief in Support of its Motion at D.E. 14).  The Railroads opposed Sompo's motion on the ground that the Carmack Amendment did not apply to the shipments at issue because the Railroads had transported the freight under private contracts. (A64 – A79).  The District Court granted Sompo's motion, holding that the Carmack Amendment exclusively

2

applied to the transportation services rendered by the Railroads, and that the Railroads could not raise limitations of liability as a defense to Sompo's Carmack claims because they had not offered full Carmack liability to Sompo's insureds. (SPA 1 – SPA 21)

After the completion of discovery, the parties filed cross-motions for summary judgment on Sompo's Carmack claims. The District Court granted summary judgment for Sompo on its Carmack claims. (SPA 22 – SPA 34)

In addition to moving for summary judgment on Sompo's claims, the Railroads also moved for summary judgment on the Common Law Claims, arguing that, if the Carmack Amendment governed the shipments at issue, those claims were preempted as a matter of law. Sompo conceded that the Common Law Claims were preempted. Accordingly, the District Court granted the Railroads motion for summary judgment with respect to the Common Law Claims, noting that only Sompo's Carmack claims remained. (SPA 25).

After the District Court entered judgment in Sompo's favor on its Carmack claims, the Railroads appealed the District Court's decision granting Sompo's motion for partial summary judgment on whether Carmack applied to the shipments at issue. In their opening brief, the Railroads argued, *inter alia,* that Carmack did not apply, and that the Railroads moved the freight at issue under private contracts. (The Railroads' appeal is docketed in this Court at 09-4268-cv).

Before the parties completed their briefing on the Railroads' appeal, the United States Supreme Court decided *Kawasaki Kisen Kaisha, Ltd., v. Regal-Beloit Corp.,* __ U.S. __, 130 S. Ct. 2433 (2010) ("*Regal-Beloit*"), which abrogated *Sompo Japan Ins. Co. of America v. Union Pacific R. Co.,* 456 F.3d 54 (2d Cir. 2006) ("*Sompo I*"). The District Court had relied on *Sompo I* when it decided that the Carmack Amendment governed the shipments at issue in this case. In *Regal-Beloit,* the Supreme Court, however, held that "the [Carmack] amendment does not apply to a shipment originating overseas under a single through bill of lading." *Regal-Beloit Corp.,* 130 S. Ct. at 2442. All of the shipments at issue in this appeal originated overseas and were governed by single, through bills of lading.

In light of the Supreme Court's decision in *Regal-Beloit*, this Court vacated and remanded the judgment entered by the District Court. In its remand order, this Court noted that "[t]he plaintiffs-appellees [i.e., Sompo] have raised ***further grounds*** they claim would support the judgment regardless of *Regal-Beloit*, but concede that they did not present these grounds below because of the state of the law at the time." (SPA 36; emphasis added) The "further grounds" were Sompo's Common Law Claims. *See* Opinion of the Honorable Denny Chin, September 4, 2012 ("Opinion I"), at SPA 43, where the District Court identifies Sompo's contract, tort and bailment claims as the "remaining claims." The "state of the law at the time" was that the Carmack Amendment applied to the shipments at issue.

Opinion I at SPA 43, note 8. As noted above, Sompo had conceded that Carmack preempted its Common Law Claims, and the District Court had dismissed those claims on preemption grounds.

Upon remand of the case to the District Court, the Common Law Claims were reinstated, and the District Court entered a briefing schedule governing dispositive motion practice on those claims. (A158). Briefing on those motions began in June of 2011 and ended in October of 2011. (D.E. 84 – 101). The Railroads argued, *inter alia,* that, under the Supreme Court's decision in *Norfolk Southern Railway Co. v. Kirby*, 543 U.S. 14 (2004) ("*Kirby*"), they could rely upon and enforce "covenant not to sue" provisions contained in the bills of lading governing the shipments, and that those "covenants not to sue" provided them with a complete contractual defense to the claims asserted by Sompo. Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, at 9 – 15 (D.E. 88).

On September 4, 2012, the District Court rendered its decision on the parties' dispositive motions. (Opinion I; SPA 37 – 51)). It found that the bill of lading issued by the ocean carrier ("the Yang Ming Bill of Lading") for one of the shipments at issue ("the Kubota Shipment") contained a valid covenant not to sue which the Railroads could enforce against Sompo's contract claim. Accordingly, the District Court dismissed Sompo's claims arising from the Kubota Shipment.

Two bills of lading, however, governed the other shipment at issue ("the Unisia Shipment"). One of those bills of lading had been issued by Yang Ming, the same ocean carrier which issued the bills of lading for the Kubota Shipment, and it contained the same valid covenant not to sue that the District Court had found enforceable, i.e., the covenant not to sue provision in the Yang Ming Bill of Lading. The other bill of lading ("the Nippon Express Bill of Lading") had been issued by a "non-vessel owning common carrier" ("NVOCC"). The District Court held that the Nippon Express Bill was ambiguous as to "what entities may be sued under its terms." Opinion I; SPA 45 – 47. In light of that ambiguity, the District Court denied the dispositive motions filed by the parties concerning the Unisia Shipment and invited the parties to submit evidence that would resolve the ambiguity in the Nippon Express Bill of Lading. SPA 47.

Pursuant to a stipulated briefing schedule, the parties submitted cross-motions for reconsideration of Opinion I and renewed cross-motions for summary judgment. The Railroads argued, *inter alia*, that the District Court need not resolve the ambiguity in the Nippon Express Bill of Lading but should, instead, rely on the holding in *Kirby.* Opinion of the Honorable Denny Chin, August 16, 2013 ("Opinion II"; SPA 52 – 63), at SPA 57. In *Kirby*, the Supreme Court had held that carriers such as the Railroads could enforce limitations of liability found in both of the bills of lading at issue in that case. The District Court found that the

6

"facts in these cases are indistinguishable from the facts in *Kirby*" and agreed with the Railroads that they could invoke the limitations of liability provision, which included the covenant not to sue provision, in the Yang Ming Bill of Lading as a defense to Sompo's claim on the Unisia Shipment.  Opinion II; SPA 58 – 59. Accordingly, the District Court denied Sompo's motion for reconsideration with respect to its previous dismissal of the claims arising from the Kubota Shipment and granted the Railroads' motion for reconsideration with respect to the Unisia Shipment.  The District Court entered judgment in the Railroads' favor and against Sompo, dismissing Sompo's Complaint in its entirety.  SPA 64 – 65.

## III.   COUNTER--STATEMENT OF THE FACTS

### A.   The Parties

Sompo is the subrogated underwriter to two shippers of freight:  Kubota Tractor Corporation ("Kubota") and Unisia of Georgia ("Unisia').  Complaint at ¶¶ 2, 10 & 16 (A26, A28, & A30).

Defendant-appellees, Norfolk Southern Railway Company ("Norfolk Southern") and Kansas City Southern Railway Company ("KCSR")(collectively, "the Railroads") are common carriers of goods by rail.  Complaint and Answer at ¶¶ 4 & 5 (A27 & A 42).

## B.     The Shipments at Issue

Kubota hired Yang Ming Transport Company ("Yang Ming") to transport tractors from its manufacturing facility in Japan, to Jefferson, Georgia, U.S.A. Opinion II; SPA 41. Yang Ming issued through bills of lading to Kubota for the transportation of its tractors. *Id.* Yang Ming provided ocean transport of the Kubota Shipment from Japan to Long Beach, California. *Id.*

Hitachi, Ltd. ("Hitachi"), through its consignee, Unisia, contracted with Nippon Express U.S.A. ("Nippon Express"), a non-vessel owning common carrier ("NVOCC"), to transport a shipment of auto parts ("the Unisia Shipment") from Hitachi's manufacturing plant in Japan to Unisia, located in Monroe, Georgia. *Id.* Nippon Express issued a through bill of lading to Hitachi/Unisia for the transportation of Hitachi's auto parts. Nippon Express then hired Yang Ming to provide the actual ocean transport of the Unisia Shipment from Japan to Long Beach, California. *Id.* Yang Ming issued a through bill of lading to Nippon Express for the Unisia Shipment. *Id.*

Upon arrival in Long Beach, Yang Ming tendered the Kubota Shipment and the Unisia Shipment to the BNSF Railway Company ("BNSF") for rail transport. *Id.* BNSF transported both shipments to Dallas, Texas where they were transferred to Norfolk Southern for the final leg of the inland carriage. *Id.* Yang Ming had retained Norfolk Southern to perform this final leg pursuant to an Intermodal

8

Transportation Agreement ("ITA") to which Yang Ming and Norfolk Southern were parties.  *Id.*

On April 18, 2006, the train carrying both the Kubota Shipment and the Unisia Shipment derailed near Dallas, Texas.  (SPA 25)  At the time of the derailment, KCSR was operating the train pursuant to an agreement that it had with Norfolk Southern.  (SPA 41)

### C.    The Bills of Lading Governing the Shipments

### 1.    The Yang Ming Bill of Lading

The bills of lading issued by Yang Ming in connection with both the Kubota Shipment and the Unisia Shipment ("Yang Ming Bill of Lading") contained identical terms and conditions.[1]  The Yang Ming Bill of Lading contains the following definitions which are critical to the issues raised by Sompo's appeal.

The Yang Ming Bill of Lading defines the "Carrier" as

> the party on whose behalf this Bill is issued, as well as the vessel and/or her Owner, demise charterer (if bound hereby), the time charterer and an substituted or Underlying Carrier whether any of them is acting as carrier or bailee.

---

[1]    Copies of the "front page" of the Yang Ming Bills of Lading governing the Kubota Shipment are at A160 – A177.  A copy of the "front page" of the Yang Ming Bill of Lading governing the Unisia Shipment is at A183.  The "back page" of the Yang Ming Bills of Lading sets forth the terms and conditions that govern freight shipments moving under the Yang Ming Bill of Lading.  A copy of that "back page" is at A244.  The parties have included in the Joint Appendix a copy of legible excerpts from the Yang Ming Bill of Lading relevant to this appeal at A241- 243.

The Yang Ming Bill of Lading defines "Underlying Carrier" as

> includ[ing] any water, rail, motor, air or other carrier utilized by the Carrier for any parts of the transportation the shipment covered by this Bill.

Yang Ming Bill of Lading, ¶¶ 1(3) & (17) (A241, A242 & A244; SPA45).

The "Exemptions And Immunities of Servants, Agents, Stevedores and Other Sub-Contractors" clause of the Yang Ming Bill of Lading contains the following provisions.

1. In contracting for the following exemptions and limitations of, and exoneration from, liability, the Carrier is acting as agent and trustee for all other Persons named in this clause. **It is understood and agreed that, other than the Carrier, no Person, firm or corporation or other legal entity whatsoever (including the Master, officers and crew of th [sic] vessel, agents, Underlying Carriers, Sub-Contractors and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.** If, however, it shall be adjudged that any Person other than the Carrier is Carrier or bailee of the Goods, or under responsibility with respect thereto, then all exemptions and limitations of, and exonerations from, liability provided by law or by the terms in this Bill shall be available to such Person.

2. It is also agreed that each of the aforementioned Persons referred to in the preceding clause are intended beneficiaries, but nothing herein contained shall be construed to limit or relieve them from liability to the Carrier for acts arising or resulting from their fault or negligent [sic].

Yang Ming Bill of Lading, ¶¶ 4(2) & (3); (A241 & A244; SPA44) (emphasis added).

10

## 2.    The Nippon Express Bill of Lading

The bill of lading issued by Nippon Express in connection with the Unisia Shipment ("Nippon Express Bill of Lading") includes rail carriers such as the Railroads in its definition of "Carrier".  Nippon Express Bill of Lading, ¶1(a); (A270 & A273; SPA45 – SPA46).[2]

The Nippon Express Bill of Lading contains the following provision which addresses liability for the acts or omissions of the Carrier's agents.

> 1.    The Carrier shall be responsible for the acts and omissions of its agents or servants when, such agents or servants are acting within the scope of their employments as if such acts and omissions were its own and also shall be responsible for the acts and omissions of any other persons whose services it makes use of in the performance of the contract evidenced by this bill of Lading.

> 2.    If it can be proved where the loss or damage occurred, the liability of the Carrier for the loss or damage to the goods will be as follows;…[w]ith respect to loss or damage occurring during the period of carriage by land or inland waterways in any country for which this Carrier has assumed the responsibility of carriage, in accordance with the applicable law of the country, the inland carrier's contract of carriage and tariffs in force, and this bill of Lading… .

Nippon Express Bill of Lading, ¶¶4(2) & 7.3(b); (A270, A271 & A273; SPA45 & SPA46).

---

[2]    A copy of the "front page" of the Nippon Express Bill of Lading governing the governing the Unisia Shipment is at A183.  The "back page" of the Nippon Express Bill of Lading sets forth the terms and conditions that govern freight shipments moving under the Nippon Express Bill of Lading.  A copy of that "back page" is at A273.  The parties have included in the Joint Appendix a copy of legible excerpts of the Nippon Express Bill of Lading relevant to this appeal at A270 - 272.

### 3. The Norfolk Southern-Yang Ming Intermodal Transportation Agreement

At the time of the derailment, Norfolk Southern and Yang Ming were parties to an "Intermodal Transportation Agreement." ("ITA"; A214 – A225). The ITA governed services rendered by Norfolk Southern to Yang Ming in connection with the rail transportation of containerized freight, including the freight at issue in this appeal. (A214).

Under the ITA, Norfolk Southern was liable for and obligated to hold Yang Ming harmless "against loss of or damage to freight in containers transported [pursuant to the] ITA…only to the extent that the sole proximate cause of said loss or damage is a railroad accident, derailment, or collision between railroad equipment negligently caused by [Norfolk Southern]." (A221).

## IV. SUMMARY OF THE ARGUMENT

### A. Sompo's "Waiver" Arguments are Meritless.

Sompo argues that the District Court's consideration of the Railroads' "covenant not to sue" defense to Sompo's breach of contract claims was improper because (1) it went beyond the scope of this Court's remand order and (2) the Railroads waived that defense by not raising it until after the first appeal.

Notably, Sompo argues that the District Court's consideration of the Railroads' defense was beyond the scope of this Court's remand order ***without***

12

*ever once identifying the parameters of that order.*    This Court remanded consideration of "further grounds [that Sompo claimed] would support the judgment regardless of *Regal-Beloit.*"  Those "further grounds" were the Common Law Claims that had been dismissed in September of 2009, and which were not reinstated until April of 2011.  The Railroads' presented its "covenant not to sue" defense in response to Sompo's breach of contract claim in their motion for summary judgment filed after that claim was reinstated.  Sompo argues further that this Court's remand order "did not provide for the consideration of new *defenses.*" It simply borders on the absurd that this Court would remand Sompo's contract claims without also remanding the Railroads' defenses to those claims.

Sompo also argues that the District Court erred when it refused to find that the Railroads had waived their "covenant not to sue" defense.  Sompo identifies eight distinct points in time when the Railroads should have or could have raised that defense but didn't.  Sompo, however, fails to recognize or acknowledge that at seven of those points in time, its contract claims were not at issue in the case and, in some instances, they were not even part of the case.  Even if Sompo could identify an instance where the Railroads should have asserted the specific provisions of the Bill of Lading, there are no grounds for finding waiver because Sompo was not prejudiced in any way by the Railroads' invoking the straight forward language of the bill of lading upon which Sompo is seeking recovery.

13

**B.    The "Covenant Not to Sue" in the Yang Ming Bill of Lading Is Unambiguous and, Therefore, Enforceable Against Sompo.**

This Court should affirm the District Court's holding that the Yang Ming Bill of Lading contains an unambiguous, enforceable covenant not to sue, which identifies the Carrier, i.e., Yang Ming, and specifies that only the Carrier can be held liable for loss or damage of the freight moving under the bill of lading. Sompo argued that the Yang Ming Bill of Lading includes entities such as the Railroads in its definition of "Carrier," and, therefore, the covenant not to sue would not protect the Railroads from suit.   The District Court rejected Sompo's argument and correctly noted that accepting Sompo's argument would render ¶4(2) the Yang Ming Bill of Lading as "useless or inexplicable."   The District Court's analysis was correct under this Court's precedent.

**C.    Application of the Supreme Court's Decision in _Kirby_ Renders Consideration of Any Ambiguity in the Nippon Express Bill of Lading Moot.**

The District Court found that the Nippon Express Bill of Lading was ambiguous with respect to whether the Railroads were protected by the covenant not to sue contained in that bill of lading.   The Court invited the parties to submit additional evidence that would assist the Court in determining the intent of the parties so that it could resolve the ambiguity.   The Railroads declined to submit any such evidence.   Instead, the Railroads, relying on the Supreme Court's holding

in *Kirby* argued that, since the Unisia Shipment moved under both the Nippon Express Bill of Lading and the Yang Ming Bill of Lading, and because the latter included the same covenant not to sue which the Court had already determined was unambiguous and enforceable, there was no need to address any ambiguity in the Nippon Express Bill of Lading. The District Court, noting that the facts of the case before it were indistinguishable from those in *Kirby*, agreed with the Railroads.

Sompo also argued – and argues here – that the District Court should have followed District Court Judge Hellerstein's decision in *Royal & Sun Alliance Insur. PLC, v. Ocean World Lines, Inc.* 572 F. Supp. 2d 379 (S.D.N.Y. 2008), *aff'd,* 612 F.3d 138 (2d Cir. 2010). The District Court did not follow *Royal & Sun* because, in that case, the court had incorrectly distinguished covenants not to sue from liability limitations. Judge Hellerstein also held that *Kirby* was not applicable to the case before him. His rejection of *Kirby*, however, was based on a misunderstanding of *Kirby's* scope.

Sompo argues that the District Court's decision contravenes long-standing public policy considerations that prohibit freight carriers from entering into contracts whereby they are exonerated from any liability for damaged freight. Sompo's argument is without merit because the covenants not to sue did not exonerate or exculpate the Railroads from their responsibility for loss or damage to the freight, nor did they leave Sompo or its insureds without a remedy. At all

times relevant to the claims asserted by Sompo, Sompo could have pursued its claims against Yang Ming for the damage to the Kubota Shipment, and against both Yang Ming and Nippon Express for the damage to the Unisia Shipment. Moreover and at all times relevant to Sompo's claims, Norfolk Southern was potentially liable to Yang Ming under their ITA, i.e., Norfolk Southern was neither exonerated nor exculpated from liability as a result of the covenants not to sue; the covenant simply enforced the need for privity of contract with respect to appropriate defendants.

### D.    Application of the Package Limitation of Liability Caps Any Recovery For Damage to the Unisia Shipment to $37,000.

Sompo argues that, with respect to the Unisia Shipment, it can recover the actual value of the freight in that shipment ($335,924) because the amount recoverable upon application of the $500 per package COGSA limitation far exceeds its actual value. Sompo's calculation is flawed, however, because it assumes that the Unisia Shipment was made up of 4005 packages. Sompo ignores long-standing Second Circuit precedent regarding the determination of what constitutes a "package". Under those rules, the Unisia Shipment was made up of only 74 packages. Therefore, any recovery that Sompo might have for the Unisia Shipment cannot exceed $37,000 (74 X $500).

## V.    <u>ARGUMENT</u>

### A. <u>Sompo's "Waiver" Arguments are Meritless.</u>

#### 1. **This Court's Remand Order Required the District Court to Consider Sompo's Common Law Contract Claim and the Railroads' Defenses Thereto.**

Although Sompo argues that the District Court exceeded the scope of this Court's remand order, Sompo failed to discuss or identify the parameters of this Court's remand order at any point in its brief.  This Court must first determine what those parameters were.  As discussed more fully below, this Court's remand order required the District Court to consider and resolve the Common Law Claims, which included Sompo's common-law breach of contract claim and the Railroads' defenses thereto.

#### a.  <u>"History" of the Common Law Claims In This Case</u>

When Sompo commenced this action, it asserted four theories of recovery for each of the shipments at issue:  a statutory-based claim under 49 U.S.C. § 11706 ("the Carmack Claim") and the three Common Law Claims.  Immediately after the pleadings closed, Sompo moved for partial summary judgment for the purpose of striking the Railroads' limitations of liability defenses.  Sompo argued that 49 U.S.C. § 11706 ("the Carmack Amendment") exclusively governed its claims against the Railroads, and that, under the Carmack Amendment, contractual limitations of liability were only enforceable if the Railroads had offered Sompo's

insureds "full Carmack liability".    The Railroads argued that the Carmack
Amendment did not apply, because they had provided rail transportation of the
freight under private contracts entered into with maritime shipping companies
("Contracts").   Sompo based its argument on this Court's decision in *Sompo Japan
Ins. Co. of Am. V. Union Pac. R.R.,* 456 F.3d 54 (2d Cir. 2006) *abrogated in part
by Kawasaki Kisen Kaisha, Ltd. v. Regal-Beloit Corp.*, 130 S. Ct. 2433 (2010)
("*Sompo I"*) which, at the time, was binding Second Circuit precedent.

The parties fully briefed and argued the issues raised by Sompo's motion.
The District Court, relying on *Sompo I*, agreed with Sompo that Carmack governed
its claims and entered partial summary judgment in Sompo's favor and against the
Railroads, striking their limitations of liability defenses.  (SPA1 – SPA15).

The Railroads then pursued discovery of Sompo and its insureds solely for
the purpose of determining whether or not Sompo could establish a *prima facie*
case of liability under the Carmack Amendment.[3]    After the close of that
discovery, the parties cross moved for summary judgment on the Carmack Claims.
In addition to moving for summary judgment on Sompo's Carmack Claim, the
Railroads also moved for summary judgment on the Common Law Claims on the

---

[3]      In order to prevail on a Carmack claim, a plaintiff must establish that the
freight at issue was in good condition at origin, in damaged condition at
destination, and damages.  *Project Hope v. M/V. IBN Sina,* 250 F.3d 67, 74 n. 6 (2d
Cir. 2001).

ground that the Carmack Amendment preempted all such causes of action. The District Court granted Sompo summary judgment on its Carmack Claim and granted the Railroads summary judgment on the Common Law Claims, noting that "Sompo concedes that such claims are preempted…". (SPA25). This occurred on September 10, 2009. (SPA 22 & SPA 25).

The Railroads then appealed the District Court's decision granting Sompo summary judgment on its Carmack Claim.[4] In their appeal, the Railroads argued, *inter alia*, that they had provided rail transportation of the freight at issue under private Contracts pursuant to 49 U.S.C. § 10709 and that Carmack did not apply.

After the Railroads filed their opening brief, but before Sompo filed its brief in response, the Supreme Court rendered its decision in *Regal-Beloit*, holding that Carmack does not apply to a shipment of freight originating overseas and moving under a single, through bill of lading, which of course describes both the Kubota and the Unisia Shipments. When Sompo filed its response brief, it argued that this Court had an independent basis to affirm the District Court's decision based on the Staggers Rail Act of 1980. At no point in its response brief did Sompo assert its breach of contract claim, presumably because that claim, along with the other Common Law Claims had been dismissed.

---

[4] The Railroads' appeal was docketed in this Court at 09-4268-CV.

19

The Railroads filed a reply brief in response to Sompo's brief.  In their brief, the Railroads argued that, even if Sompo's breach of contract claims had not been dismissed, Sompo lacked privity of contract to pursue those claims.  During the pendency of their appeal, the Railroads had no reason to argue contractual defenses to Sompo's common-law breach of contract claims, for the simple reason that those claims were no longer part of the case.

On October 22, 2010, this Court filed its mandate with the District Court remanding these proceedings for further consideration.  In its remand order, this Court noted that the parties had "agreed that the Supreme Court['s decision in *Regal-Beloit*] had abrogated the precedent on which the district court relied." (SPA 36)  This Court further noted that Sompo had "raised further grounds that [it] claim[ed] would support the judgment regardless of *Regal-Beloit,* but concede[d] that [it] did not present these grounds below because of the state of the law at the time."  *Id.*  The "state of the law at the time" was that the Carmack Amendment applied to the shipments at issue.  That changed when the Supreme Court announced its decision in *Regal-Beloit.*

On December 14, 2010, the District Court held a status conference where all counsel were present.  (D.E. dated 12/14/10; A15).  During that conference, the District Court provided the parties with ninety days to complete fact and expert discovery following the reinstatement of the Common Law Claims.  *Id*.  The Court

also set a briefing schedule for the parties' to submit dispositive motions concerning those claims.  The briefing schedule provided that the Railroads "go first" with their dispositive motions followed by Sompo's response and a cross-motion.  (D.E. 83; A15)  Pursuant to that briefing schedule, the Railroads filed their motion for summary judgment on June 29, 2011, in which they argued, *inter alia*, that Sompo's contractual claims were barred by the covenants not to sue. (D.E. 84 – 88)

### b. The District Court's Consideration of the Railroads' Contract Defenses Was Consistent With the Express Terms of the Remand Order.

In this Circuit, a "district court's actions on remand should not be inconsistent with either the express terms or the spirit of the mandate."  *Ginett v. Computer Task Croup, Inc.,* 11 F.3d 359, 361 (2d Cir. 1993).  Here, this Court's mandate covered "further grounds" that Sompo argued would support its claims, but which had not been previously presented because of "the state of the law at the time."  In fact, Sompo had already conceded that, because of "the state of the law at the time", those claims were preempted by its Carmack Claim and should be dismissed.  In light of the procedural history of this case in general, and of the Common Law Claims in particular, the "further grounds" referenced in this Court's remand order can only be the Common Law Claims in general and, for

purposes of this appeal, Sompo's common law, breach of contract claim in particular.

Sompo essentially argues that the District Court should have only considered those "further grounds" identified by Sompo, i.e., the Common Law Claims, and that it should not have considered the Railroads' defenses to those claims. Sompo's Opening Brief, at 15 and 21. The argument is absurd on its face. This Court could not have possibly intended that the District Court consider Sompo's claims, but that it should not consider the Railroads' defenses to those claims.

Both the letter and the spirit of this Court's remand order encompassed *both* the Common Law Claims asserted by Sompo *and* the Railroads' defenses to those claims. Sompo has pursued claims arising from the contracts governing the Kubota and the Unisia Shipments, i.e., breach of the Yang Ming and Nippon Express Bills of Lading. Both of those bills of lading contain covenants not sue. If the District Court was to consider Sompo's claims based on the terms and conditions of those bills of lading, then the District Court also had to consider any defenses available to the Railroads arising from those same terms and conditions.

Finally, the cases that Sompo relies on in support of its argument that the District Court deviated from this Court's prior mandate are inapposite. A review of case law cited by Sompo reveals that those cases are both factually and procedurally distinguishable. For example, in *In re Coudert Bros. LLP*, 2013

Bankr. LEXIS 3360 (Bankr. S.D.N.Y. Aug. 19, 2013), the bankruptcy court denied a plaintiff's motion for reconsideration on remand. The court based its decision on the fact that the plaintiff failed to appeal the court's initial holding that the plaintiff waived its argument, and that the Court of Appeals did not expressly or implicitly address that holding on appeal. Unlike *In re Coudert Brothers*, neither this Court nor the District Court ever determined that the Railroads waived their covenant not to sue defense. In addition, neither the District Court nor this Court ever considered, much less ruled, expressly or implicitly, on the Railroads' covenant not to sue defense prior to remand, because that argument was foreclosed by the District Court's pre-*Regal-Beloit* ruling that the Carmack Amendment governed. The other cases relied on by Sompo involve remands where this Court expressly limited the scope of the remand, and where the district court ventured well beyond that scope.

The present case does not involve a limited remand meant to address a single specific issue such as the remand orders in the cases Sompo cites. Nothing in this Court's remand order contains such limiting language.  The District Court's consideration of the Railroads' defense to Sompo's contract claim was well within the scope of the remand order.

## 2. The Railroads Did Not Waive Their Covenant Not to Sue Defense.

Sompo also argues that, because the Railroads did not raise the covenant not to sue defense until they filed their dispositive motion after remand, they have waived that defense. In this Circuit, "[a] district court may still entertain affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay in the proceedings." *Saks v. Franklin Covey, Co.¸* 316 F.3d 337, 350 (2d Cir. 2003). Moreover, "waiver of an unpleaded defense may not be proper where the defense is raised at the first ***pragmatically possible time*** and applying it at that time would not unfairly prejudice the opposing party." *Rose v. AmSouth Bank of Florida,* 391 F.3d 63, 65 (2d Cir. 2004)(emphasis added). Undue prejudice is the key factor to be considered when determining whether an affirmative defense has been waived. In addition, the Court must consider whether or not it was "pragmatically possible" for the defendant to raise a defense at an earlier time. The Railroads raised the covenant not to sue defense at a time when it was "pragmatic" to do so, and to have raised it earlier would have had no effect on the resolution of Sompo's claims. More importantly, Sompo has suffered no prejudice, undue or not, as a result of the Railroads' timing of their defense.

### a. The Railroads Raised Their Defense When It Was Pragmatic to Do So.

Here, Sompo has identified eight "separate, critical junctures" in time when the Railroads should have raised the covenant not sue defense.  Those points in time are as follows:

1.    the Railroads' Answer to Sompo's Complaint;

2.    the Railroads' opposition to Sompo's motion for partial summary judgment to strike the Railroads' limitations of liability defenses to Sompo's Carmack Claim ("Sompo's MPSJ");

3.    at oral argument on Sompo's MPSJ;

4.    the Railroads' motion for reconsideration of the District Court's ruling on Sompo's MPSJ;

5.    the Railroads' opening brief in support of their motion for summary judgment on Sompo's Carmack Claim;

6.    the Railroads' opposition to Sompo's motion for summary judgment on its Carmack Claim.

7.    the Railroad's opening brief in the prior appeal from the District Court's original summary judgment decision; and

8.    the Railroads' "post *Regal-Beloit* brief in the prior appeal."

Sompo's Opening Brief at 16, 24 and 27.

The events which appear in items 2 – 4 above all occurred in connection with Sompo's MPSJ.  The issues raised by that motion and the Railroads' response to that motion were (1) did the Carmack Amendment govern the Railroads' liability to Sompo,  or (2) did the ITA to which Norfolk Southern and Yang Ming, the ocean carrier, were parties govern that liability under 49 U.S.C. § 10709. (SPA3).   The District Court held that Carmack did apply, that the ITA was not a "10709 Contract", that, even if the ITA were a 10709 Contract, the Railroads would have been required to offer the shippers (Sompo's insureds) full, Carmack liability, which they had not done, and that, therefore, the Railroads could not limit their liability under the ITA. (SPA12).[5]

The Railroads submitted three briefs in connection with Sompo's MPSJ:  (1) their response to Sompo's initial brief (A64 – A79); (2) their brief in support of a motion for reconsideration (A125 – A151); and (3) their reply brief in support of their motion for reconsideration (A152 – A157).   In addition, the Railroads' counsel appeared at and participated in oral argument on that motion.  (A80 – A124).   In each of their briefs as well as at oral argument, the Railroads focused solely on the issues raised by Sompo's MPSJ, i.e., did the Carmack Amendment

---

[5]     The District Court stated that, when deciding whether a 10709 Contract governed the freight shipments, it "relied principally on the ITAs," and that it did not consider the bills of lading germane to its resolution of the issues raised by Sompo's MPSJ. (SPA 18 – 19)

govern the Railroad's liability, or did the ITA govern that liability. The presence (or absence) of enforceable covenants not to sue in the bills of lading would have had no bearing on the resolution of either of those issues for two reasons.

First, the Railroads could not have argued that the covenants not to sue contained in the bills of lading provided a defense to Sompo's Carmack Claim for the simple reason that there are a limited number of recognized defenses to a Carmack claim. Once a shipper has established a *prima facie* case against a carrier under the Carmack Amendment, the *only* defense available to a carrier is to show that it was not negligent *and* that the damage to the freight was caused by (1) an act of God, (2) an act of a public enemy, (3) an act of the shipper, (4) an act of a public authority, or (5) the inherent vice of the shipment. *Mo. Pac. R.R.Co., v. Elmore & Stahl,* 377 U.S. 134, 137, 84 S. Ct. 1142 (1964). Moreover, a claim pursued under Carmack preempts any common-law causes of action that a freight shipper might assert, as well as any applicable defenses.

Secondly, it would have made no sense for the Railroads to argue that the covenant not to sue in the bills of lading provided the Railroads with a defense to claims based on a breach of the bill of lading contracts **without first having a ruling that Carmack *did not apply***. Any argument in response to Sompo's MPSJ invoking the covenant not to sue would have been, at best, superfluous absent such

a ruling.  Any such argument would certainly have had no relevance to the issues under consideration by the District Court when it considered Sompo's MPSJ.

The existence of an enforceable covenant not to sue would have had no bearing on the District Court's determination that the Carmack Amendment, and not the ITA applied to the shipments at issue.  There was certainly no "pragmatic" or legal reason for the Railroads to have raised this contractual provision in opposition to Sompo's PMSJ.

Sompo also identifies the Railroads' submissions in connection with dispositive motions filed by the parties on Sompo's Carmack Claim (items 5 – 6 above) as points in time when the Railroads should have raised the covenant not to sue defense.  Sompo's argument with regard to those submissions is absurd.  The sole issue raised by the parties in their cross motions for summary judgment was whether Sompo had established a *prima facie* case as a shipper under the Carmack Amendment.  (SPA26).  To resolve that issue, the District Court had to decide whether the freight at issue had been tendered to the carrier in good condition, had arrived at destination in damaged condition, and the amount of damages caused by the loss.  *Id.*

As can be readily seen in the District Court's opinion granting Sompo's motion and denying the Railroads' motion, no terms in the Yang Ming bills of lading had any bearing on its decision.  (SPA22 – SPA32).  The existence of a

covenant not to sue in the bills of lading could not have "trumped" the statutory remedy and standing available to Sompo under the Carmack Amendment. There was simply no "pragmatic" or legal reason for the Railroads to raise the covenant not to sue as a "defense" to Sompo's Carmack Claim. At that particular stage of the litigation, the only remarkable events affecting Sompo's breach of contract claim – or any defense that the Railroads might have to that claim – was Sompo's concession that its claims under any contracts were preempted and the Court's dismissal of those claims (as well as the other Common Law Claims) in connection with its ruling on the parties' motions. (SPA25).

Sompo's breach of contract claim simply had no relevance to any issue being litigated during the time when Sompo was pursuing recovery based on the Carmack Amendment. Carmack is purely a statutory remedy, which imposes a strict liability scheme upon carriers. For that reason, the Railroads' assertion of any contract defenses arising from those bills of lading would have been legally irrelevant.

Sompo's focus on briefs filed by the Railroads in connection with their appeal of the District Court's decision granting Sompo summary judgment on its Carmack Claim (items 7 & 8 above) is misplaced. The only issue raised by the Railroads' appeal was whether the District Court had erred when it granted Sompo's MPSJ, holding that the Carmack Amendment governed Sompo's claims.

The covenant not to sue defense was no more relevant, either pragmatically or legally, to the issues raised in that appeal than they were to the issues raised by Sompo's MPSJ or by the Carmack-related summary judgment motions. Throughout the pendency of the prior appeal, Sompo's Common Law Claims were not part of the case as they had been dismissed prior to the appeal, and were not reinstated until after this Court entered its remand order. [6]

The Railroads answered Sompo's original Complaint on May 21, 2007. (A4). Admittedly, the Railroads did not expressly plead the covenant not to sue as an affirmative defense. Nothing of a substantive nature occurred in this case until Sompo filed its motion for partial summary judgment three months later on August 30, 2007. (A5). From that point on until September 10, 2009, there was not a single issue litigated in this case that implicated in any way the provisions in the Yang Ming and Nippon Express Bills of Lading. From September 10, 2009, when the District Court dismissed the Common Law Claims, until April 11, 2011, when they were reinstated in connection with this Court's remand, there was no claim of record to which a covenant not to sue provided a defense. There was simply no point in time since the inception of this lawsuit until the reinstatement of the

---

[6]     In the Railroads' reply brief filed in the prior appeal, the Railroads did argue that, even if the Common Law Claims had not been dismissed, they would be entitled to summary judgment on those claims because (1) Sompo lacked the privity necessary to maintain claims under the bills of lading and under the ITA and (2) under *Regal-Beloit,* the Railroads did not have to offer Carmack liability for the freight shipments at issue.

30

Common Law Claims when it would have been "pragmatic" for the Railroads to assert that defense.

### b. The Assertion of the Covenant Not to Sue Defense Was Appropriately Raised at the Summary Judgment Stage of This Litigation.

Sompo also argues that the Railroads waived their covenant not to sue defense when it did not expressly assert that defense as an affirmative defense in its Answer to Sompo's Complaint. The Railroads acknowledge that they did not assert an affirmative defense expressly based on the covenant not to sue when it answered Sompo's Complaint. That fact, however, standing alone is not grounds for finding that the Railroads waived that defense. As discussed more fully below, there is no requirement in the Federal Rules of Civil Procedure that a defendant plead every conceivable legal argument as an affirmative defense. And as previously noted, the key factor to be considered when determining whether a defense has been waived is whether the plaintiff has been unduly prejudiced by the "late" assertion of a defense.

There is no requirement that a defendant plead every conceivable legal argument as an affirmative defense. Instead the Federal Rules require that a defendant plead nineteen specifically identified defenses and "any avoidance or affirmative defense". Fed. R. Civ. P. 8(c). Conspicuously absent from the list of affirmative defenses is "covenant not to sue". Sompo has not identified, nor are

31

the Railroads aware of any court that has *ever* refused to consider a covenant not to sue argument on its merits for failure to plead it as an affirmative defense. 2-8 MOORE'S FEDERAL PRACTICE - CIVIL § 8.08[5] (listing defenses that courts have found to be required by Rule 8).[7]

### c. Sompo Has Not Suffered Any Prejudice Resulting From the Railroads' Assertion of the Covenant Not to Sue Defense at the Summary Judgment Stage.

Even if a covenant not to sue were a required affirmative defense, the Railroads' failure to plead it as such would not preclude consideration of its merits in this case. As explained by the United State Supreme Court, the reason for pleading affirmative defenses is to avoid surprise and to give the opposing party an opportunity to respond. *Blonder-Tongue Lab. v. University of Ill. Found.*, 402 U.S. 313, 350 (1971). Therefore, a party may assert an unpled affirmative defense at

---

[7] Plaintiffs cite only one case in support of their argument that "covenant not to sue is an affirmative defense that must be expressly pled", that actually concerns both Rule 8 pleading requirements and covenants not to sue. *Erwin v. S. Regency Tennis Ctr. LLC*, 2010 U.S. Dist. LEXIS 54100 (S.D. Ohio May 11, 2010). In *Erwin*, the defendant moved to dismiss the plaintiff's complaint because he had previously signed a release agreement containing a covenant not to sue. Even though release *is* a required affirmative defense under Rule 8(c), the defendant failed to plead it. Thus the court mentioned in *dictum* that the defendant was relying on the release agreement, and the covenant not to sue provision in particular, without pleading any affirmative defense to that effect. In addition, federal law is clear that covenants not to sue are separate and distinct from releases. *See*, *e.g.*, *Locafrance U.S. Corp. v. Intermodal Systems Leasing Inc.*, 558 F.2d 1113, 1115 (2d. Cir. 1977) (discussing the difference between releases and covenants not to sue), *See also Nipponkoa Ins. Co., LTD v. Norfolk S. Ry. Co.*, 794 F. Supp. 2d 838, 844 (S.D. Ohio 2011).

the summary judgment stage of the proceedings so long as it would not expose the opposing party to undue prejudice.  *See*, *e.g.*, *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350-351 (2d Cir. 2003).

The District Court disposed of Sompo's waiver argument in its initial decision granting the Railroads' summary judgment on the Kubota Shipment based on the Yang Ming Bill of Lading's covenant not to sue.  (SPA43, at note 8).  The Court noted that there was no evidence of bad faith on the part of the Railroads, and that its consideration of the defense would not either unduly prejudice Sompo or cause any delay in the proceedings.  *Id.*  The Court relied on this Court's ruling in *Saks v. Franklin Covey* when making that ruling.  *Id.*

Here, Sompo does not argue either "bad faith" or "undue delay."  Instead, as it did in the District Court, Sompo contends that it was unduly prejudiced by the Railroads' assertion of the defense after the case had been remanded.  Sompo does not, however, expressly articulate anywhere in its opening brief how it has been prejudiced, unduly or otherwise.  Sompo suggests that it has been prejudiced because "the parties (and the Court) expended years of time and expense on the first round of summary judgment motions, reargument of the decision on that motion; on the earlier summary judgment motions; discovery; appeal; and now this appeal."  Sompo's Opening Brief at 29.  All of the issues litigated in the first two rounds of dispositive motion practice arose solely from Sompo's insistence that the

Carmack Amendment, and only the Carmack Amendment, governed its claims against the Railroads.  The covenant not to sue defense would have had no practical or legal impact on the District Court's resolution of those issues or the amount of time and expense necessary to litigate those issues.

Sompo also implicitly argues that it has been prejudiced because it has "expended hundreds of thousands of dollars in wasted attorney time on (now no longer deemed pertinent) prior issues."  Sompo's Opening Brief at 28.  Sompo expended that money vigorously pursuing its Carmack Claims to the exclusion of any of the Common Law Claims, knowing full well that the latter claims were preempted by their assertion of a cause of action based on the Carmack Amendment.  The covenant not to sue defense had no relevance to any of the issues raised by the parties when they were litigating the applicability of Carmack to Sompo's claims, or whether Sompo had satisfied the elements of a *prima facie* Carmack claim.  Sompo's expenditure of hundreds of thousands of dollars in attorney time only became "wasted" when the United States Supreme Court ruled that the Carmack Amendment does not apply to the inland portion of a freight shipment originating overseas and moving under a through bill of lading.

Notably, Sompo does not argue that it was unable to properly prepare a response to the covenant not to sue defense because of its assertion "late" in the

litigation and was, therefore, unduly prejudiced.  Had Sompo even made such an argument, it would have been to no avail for several reasons.

First, upon remand, the District Court provided the parties an additional ninety days to conduct fact and expert discovery. (D.E. dated December 14, 2010; A15).  Although the Common Law Claims had not been formally reinstated at that time, they were the only claims that Sompo could potentially pursue in light of the *Regal-Beloit* decision.

In addition, in response to the Railroads' summary judgment motion in which they identified the covenant not to sue defense (D.E. 88), Sompo could have moved (but did not) for additional time to take discovery on that defense, pursuant to Fed. R. Civ. P. 56(d)(2).  Instead, Sompo chose to make the same "waiver" argument in its response to the Railroads' motion that it is making here.[8]

Finally, when the District Court granted the Railroads' motion for summary judgment on the covenant not to sue in the Yang Ming Bill of Lading, it also found that the covenant not to sue in the Nippon Express Bill of Lading was ambiguous

---

[8]    *See* Sompo's brief in response to the Railroads' motion for summary judgment and in support of its cross-motion for summary judgment (D.E. 94) at 17 – 19.

Fed. R. Civ. P. 56(d)(2) requires the movant to submit an affidavit or declaration that "specifie[s] reasons [why] it cannot present facts essential to justify its opposition" and that articulates with specificity the discovery desired. *See, e.g., Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). Perhaps Sompo recognized that the issues raised by the Railroads' covenant not to sue defense were purely legal, and that there was no fact discovery it could possibly undertake in order to prepare a response to the defense.

with respect to whether it protected the Railroads.  Because of that ambiguity, the District Court invited the parties to develop and submit additional evidence that would assist the Court in resolving that ambiguity.  (SPA47).  In addition to that "invitation", the District Court allowed the parties to submit motions for reconsideration and/or renewed motions for summary judgment in which they could address, *inter alia*, the ambiguity the Court had found in the Nippon Express Bill of Lading.  (D.E. 110).  The parties responded to the Court's invitation by submitting additional briefing.  Included among the materials submitted by Sompo were two Declarations:  one of which was executed by an individual purporting to be an expert in transportation contracts who opined as to the enforceability of covenants not to sue (D.E. 113, A512); the other was executed by an employee of Nippon Express who attested to his employer's intent with respect to the covenant not to sue in the Nippon Express Bill of Lading.  (D.E. 112; A508).

Sompo had multiple opportunities to prepare its response to the covenant not to sue defense after that defense was identified.  Sompo cannot be heard to argue that the Railroads' "late" assertion of that defense prevented it from preparing a response to that defense.  This Court should, therefore, reject Sompo's waiver argument.

### B. The "Covenants Not to Sue" in the Yang Ming and Nippon Express Bills of Lading Are Enforceable Against Sompo.

The District Court initially held that resolution of the claims arising from the Kubota and Unisia Shipments turned on whether the Yang Ming and Nippon Express Bills of Lading contained enforceable covenants not to sue. After extensive briefing on that issue, the District Court correctly concluded that the Yang Ming Bill of Lading contained an enforceable covenant not to sue that protected the Railroads, and that it did not matter whether the covenant not to sue contained in the Nippon Express Bill of Lading extended to the Railroads. Sompo argues that the District Court erred because (1) the covenants not to sue are "exoneration clauses", and rail carriers cannot avail themselves of "exoneration" clauses to avoid liability for damage to freight; (2) the Yang Ming Bill of Lading is ambiguous and, therefore, unenforceable and (3) the Nippon Express Bill of Lading does not contain a covenant not to sue and, if it does, it is ambiguous and, therefore, unenforceable. As discussed in greater detail below, all of Sompo's substantive legal arguments are without merit.

### 1.  The "Covenants Not to Sue" Are Not "Exoneration Clauses."

Sompo's repeated characterization of the covenants not to sue as "complete exoneration" clauses is, at best, hyperbole, and, at worst, a gross mischaracterization of those provisions. The District Court based its rejection of Sompo's "exoneration" argument on the fact that, notwithstanding the covenants

37

not to sue, Sompo still had a remedy against the carriers that had issued the bills of lading to Sompo's insureds.  (SPA49 – SPA50).

Sompo argues that enforcement of the covenants not to sue effectively "exonerates" the Railroads from any liability for damage to freight caused by their negligence.  Sompo's argument ignores the provision in the ITA pursuant to which Yang Ming can seek full indemnification from Norfolk Southern for damage to freight moving under the ITA.[9]

The contracts that covered the Kubota Shipment provided the shipper (or its insurer) with a remedy against Yang Ming under the Yang Ming Bill of Lading for damage to the shipper's freight, and provided Yang Ming with a remedy against Norfolk Southern under the ITA for any liability Yang Ming may have to the shipper.  The contracts that covered the Unisia Shipment provided the shipper (or its insurer) with a remedy against Nippon Express under the Nippon Express Bill of Lading for damage to the shipper's freight, provided the shipper (or its insurer) and Nippon Express with a remedy against Yang Ming under the Yang Ming Bill of Lading, and provided Yang Ming with a remedy against Norfolk Southern under the ITA for any liability Yang Ming may have to the shipper or to Nippon Express.  In other words, the presence of covenant not to sue clauses in the two bills of lading at issue had no impact whatsoever on either (1) the shipper's or Sompo's

---

[9]        Paragraph 12 of the ITA. (A221 – A222).

ability to recover their damages or (2) Norfolk Southern's liability for any damage to the freight that it may have caused.

To support its argument that the covenants not to sue are unenforceable exoneration clauses, Sompo cites cases which repeat the general rule that common carriers may not exonerate themselves from all negligence. But the cases on which Sompo relies have nothing to do with covenants not to sue in general, or the covenants not to sue at issue here, because such covenants do not deprive shippers of their right to pursue all of their damages for freight damaged in transit. The legal effect of the covenants not to sue is simply to require a shipper (or its insurer) to pursue its damages against the party with whom they contracted.

As another federal district court recently explained when confronted with an identical argument presented by the same counsel representing Sompo in this appeal, a covenant not to sue "does not affect [the shipper's insurer's] ability to recover all of its damages from [the ocean carrier], nor does it allow Norfolk Southern to escape liability given that [the ocean carrier] may still seek indemnification." *Nipponkoa Ins. Co.,* 794 F. Supp. 2d at 843. "That Plaintiffs have chosen not to avail themselves [of] their rights against the [ocean] carrier, does not render the Bills of Lading and the covenant not to sue contained therein contrary to COGSA." *Id*. (*quoting Ltd. Brands, Inc. v. F.C. (Flying Cargo) Int'l Transp. Ltd.*, 2006 U.S. Dist. LEXIS 17029, *25 n.7 (S.D. Ohio Mar. 27, 2006)).

39

Put simply, "the rule against stipulations of immunity is not contravened by a clause that creates no immunity." *Id.* at 844.

The Ninth Circuit Court of Appeals reached an identical conclusion, holding that federal maritime law permits an ocean carrier "to accept exclusive liability for the negligence of its subcontractors". *Fed. Ins. Co. v. Union Pac. R.R*, 651 F.3d 1175, 1180 (9th Cir. Cal. 2011), (*citing Kirby*, 543 U.S. at 35) (validating under COGSA an ocean carrier's efforts to limit the liability of sub-contractors in part because the shipper "retain[ed] the option to sue . . . the carrier[ ] for any loss that exceeds the liability limitation"); *see also Mattel, Inc. v. BNSF Ry. Co*., 2011 U.S. Dist. LEXIS 495, 2011 WL 90164, at *10 (C.D. Cal. Jan. 3, 2011) ("Covenants not to sue are not impermissible under Section 1303(8) of COGSA"), *St. Paul Travelers Ins. Co. v. M/V Madame Butterfly*, 700 F. Supp. 2d 496, 503, 505 (S.D.N.Y. 2010) *aff'd on other grounds* 433 Fed. Appx. 19 (2d Cir. N.Y. 2011), *Allianz CP Gen. Ins. Co. v. Blue Anchor Line*, 2004 U.S. Dist. LEXIS 8175, 2004 WL 1048228, at *6 (S.D.N.Y. May 7, 2004), *Ltd. Brands,* 2006 U.S. Dist. LEXIS 17029. [10]

The rule against carrier exoneration clauses is based upon a public policy consideration which is that the threat of liability acts as a deterrent to ensure that a

---

[10]   Surprisingly, Sompo has recycled virtually all of the same cases that the district court found inapplicable in *Nipponkoa Ins. Co., LTD v. Norfolk S. Ry. Co.,* referenced above. *Nipponkoa*, 794 F. Supp. 2d at 843-844.

carrier exercises due diligence in carrying out its obligations. *See Klicker v. Northwest Airlines, Inc.*, 563 F.2d 1310, 1313 (9th Cir. 1977) ("A carrier who stipulates not to be bound to the exercise of care and diligence 'seeks to put off the essential duties of his employment.'") (*quoting Santa Fe P. & P.R. Co. v. Grant Bros. Construction Co.*, 228 U.S. 177, 33 S. Ct. 474, 57 L. Ed. 787 (1913)); *see also Shippers Nat'l Freight Claim Council, Inc. v. Interstate Commerce Com.*, 712 F.2d 740, 746 (2d Cir. 1983) ("exculpatory contracts were held to violate public policy because they would tend to invite carelessness on the part of the carrier."). In other words, by allowing a carrier to insulate itself from *all* liability, the carrier has no reason to perform its duties with the proper degree of care.

In the instant case, the policy underlying the rule against carrier exoneration clauses is not implicated. As a party to the ITA with Yang Ming, Norfolk Southern was not insulated from all liability and had every incentive to perform its obligations with the appropriate degree of care because it could ultimately be held fully liable to Yang Ming.

Finally, Sompo argues that the District Court "mistakenly" characterized the covenants not to sue as "limitations of liability" rather than as "exoneration clauses." Sompo's Opening Brief at 18. Those provisions are not exoneration clauses for the reasons discussed above. The District Court did not err when it

characterized the covenants not to sue as a limitation of liability.  (SPA49) & (SPA59).

There is no basis, either in law or in fact, for construing the covenants not to sue as "exoneration clauses."  The District Court correctly rejected this argument.

### 2. The Covenant Not to Sue in the Yang Ming Bill of Lading Unambiguously Protects the Railroads From Suit Initiated by the Shippers or Their Insurers to Recover for Damage to Freight.

The District Court held that Section 4(2) of the Yang Ming Bill of Lading unambiguously prohibits Sompo's insureds from pursuing any entity other than the "Carrier" for damage to freight which moved under only that bill of lading. (SPA44).  Section 4(2) expressly identifies "Underlying Carriers" and "Sub-Contractors" as entities who are not subject to suit for freight damage claims.  *Id.* The District Court also relied on Section 1(3) of the Yang Ming Bill of Lading which defines "Carrier" as the "party on whose behalf this Bill is issued", i.e., Yang Ming, and Section 1(17) which includes "rail carriers" in its definition of "Underlying Carriers."  (SPA45).

Sompo had argued and continues to argue that Section 1(3) also includes "Underlying Carriers" in its definition of "Carrier."  Therefore, at least according to Sompo, rail carriers are subject to suit for freight damage under Section 4(2) as a "Carrier".  The District Court rejected Sompo's argument for two reasons.

42

First, the District Court noted that Section 4(2) expressly identifies "Underlying Carriers", among others, as entities "that are not liable." (SPA45). The District Court explained that "[t]he phrase 'Underlying Carriers' appears in Section 4(2) in the parenthetical as a specification of the entities that are *not* liable." (SPA45). Although an "Underlying Carrier" may be considered a "Carrier" generally when considering other provisions in the bill of lading, that same Underlying Carrier is not a Carrier with respect to the application of Section 4(2).

For example, Section 2 of the Yang Ming Bill of Lading incorporates the terms and conditions of "Carrier's" tariffs as part of the bill of lading without exception. (A192). Arguably under that section, the tariffs of Underlying Carriers would also be incorporated into the bill of lading. By way of further example, Section 25 provides that the Carrier "shall have a lien on the Goods" being shipped under the bill of lading without any qualification or limitation on who is a Carrier. (A192). Arguably, Underlying Carriers would also have a lien on those goods under Section 25. In other words, Section 4(2) does nothing more than create several exceptions to the definition of "Carrier" for purposes of identifying entities that can be held liable under the bill of lading for damaged freight, or, as stated by the District Court, Section 4(2) "specifies" which entities "are not liable."

Secondly, the District Court certainly recognized that the inclusion of "Underlying Carrier"  within the definition of "Carrier" in one clause and the exclusion of "Underlying Carrier" as a Carrier in another may create ambiguity. (SPA45).   The District Court, however, recognized that adopting Sompo's interpretation of the provision would render Section 4(2) "useless or inexplicable," *quoting Hartford Fire Ins. Co., v. Orient Overseas Container Lines, Ltd.,* 230 F.3d 549, 558 (2d Cir. 2000) (SPA45).  In *Hartford Fire*, this Court said that "[i]n a situation of *potential contract ambiguity*, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable."  *Id.* (emphasis added).  In *Hartford Fire*, this Court recognized that a "potential contract ambiguity" can be avoided if a contract is interpreted in such a way that all the terms of the contract have "a reasonable and effective meaning."   By applying the rule from *Hartford¸* a potentially ambiguous provision becomes an unambiguous provision and, more importantly, all of the terms and conditions of the contract are given effect and meaning.

Sompo also argues that, because the covenant not to sue is ambiguous, it must be strictly construed against the carrier.  Sompo's Opening Brief at 42.  As discussed above, characterizing the covenant as ambiguous and then resolving the

44

ambiguity against the Railroads as Sompo suggests would effectively render Section 4(2) meaningless.

In support of its position that the provision should be construed against the carrier, Sompo relies on several cases where the court construed contract provisions against the entity seeking to benefit from those provisions. Those cases, however, are easily distinguishable from the facts of this case. For example, in *Toyomenka, Inc., v. S.S. Tosaharu Maru,* 523 F.2d 518, 521 (2d Cir. 1975), this Court noted "that each case turns on the provisions of the particular bill of lading." *Toyomenka,* 523 F.2d at 522. In *Toyomenka,* this Court ultimately held that an independent contractor of a stevedore was not an intended beneficiary of the limitations of liability provision in the subject bill of lading. This Court also noted that the provision at issue lacked the "clarity and precision which we have previously required" when applying contractual grants of immunity or limitations of liability provisions in bills of lading. *Id.*

Sompo also relies on the decision rendered in *Lucky-Goldstar Intern. (America), Inc., v. S.S. California Mercury,* 750 F. Supp. 141 (S.D.N.Y. 1990), where the court applied the rule that "contracts purporting to grant . . . limitation from liability must be strictly construed and limited to intended beneficiaries."

45

*Lucky-Goldstar,* 750 F. Supp. at 145 (citations omitted).[11]  In addition, the court stated that bills of lading containing such provisions shall be strictly construed against the parties who would benefit from such a provision.    *Id.* (*citing Toyomenka).*  The court noted that the provision in question lacked the required clarity needed to determine the scope of the limitations provisions and, therefore, the court needed additional information regarding the intent of the parties.

The decisions rendered in both *Toyomenka* and *Lucky-Goldstar*, where the courts found unclear, imprecise and ambiguous provisions in bills of lading and then construed those provisions against the entity that would benefit from them, did not result in rendering those provisions meaningless, or "useless or inexplicable."  The end result in both cases was simply that the party seeking the benefits of those provisions was precluded from doing so.

Here, construing Section 4(2) against the Railroads because of the so-called ambiguity identified by Sompo would render Section 4(2) "useless or inexplicable."  Under this Court's rule, as stated in *Hartford,* such a result should be avoided.

The Yang Ming Bill of Lading unambiguously identifies "the Carrier" as the entity which issued the bill of lading, i.e., Yang Ming, as well as other entities

---

[11]    Here, the Yang Ming Bill of Lading specifies that "Underlying Carriers," which include "rail carriers", are "intended beneficiaries" of Section 4(2).  Yang Ming Bill of Lading ¶ 4(3); (A 241 & 243; SPA 44).

including "Underlying Carriers."  It unambiguously includes rail carriers within the definition of "Underlying Carriers." It unambiguously identifies "the Carrier", and only "the Carrier", as the entity that can be deemed liable for damage to freight shipped under the bill of lading.  And finally, it unambiguously *excludes* Underlying Carriers as entities that can be deemed liable for damage to freight shipped under the bill of lading.  Section 4(2) has "the clarity and precision" that this Court requires when determining the scope of a limitation of liability.

The District Court interpreted Section 4(2) of the Yang Ming Bill of Lading as creating an exception to the definition of "Carrier" which limits the universe of entities that are potentially liable for damage to freight.  The District Court's interpretation is the only interpretation that would not render the parenthetical creating that exception meaningless.

### 3.  The Supreme Court's Decision in *Kirby* Renders Consideration of the Ambiguity in the Nippon Express Bill of Lading Moot.

In its initial opinion addressing the covenants not to sue, the District Court denied the Railroads' motion for summary judgment on the Unisia Shipment because of the ambiguity it found in the Nippon Express Bill of Lading.  (SPA47 & SPA50).  That ambiguity prevented the District Court from determining "whether the terms of the Nippon Express bill effectively limit[ed] who plaintiffs may sue under the bill…".  (SPA47)  Although the District Court indicated in its opinion that it needed evidence of the intent of the parties to that bill of lading in

47

order to resolve that ambiguity, the Railroads declined to submit any such evidence. Instead, the Railroads argued that, in light of the Supreme Court's decision in *Kirby*, there was no need for the Court to resolve that ambiguity. The District Court agreed and ultimately granted the Railroads summary judgment on the Unisia Shipment based on the covenant not to sue in the Yang Ming Bill of Lading which also governed that shipment. (SPA58 – SPA 60).

Sompo does not directly attack the District Court's reliance on *Kirby* anywhere in its Opening Brief. Sompo, however, does indirectly argue that the District Court's reliance on *Kirby* was misplaced, and that District Judge Hellerstein's opinion in *Royal & Sun Alliance Ins. PLC. V. Ocean World Lines, Inc.,* 572 F. Supp. 2d 379 (S.D.N.Y 2008) reflects the correct interpretation of *Kirby*. Sompo's Opening Brief at 38 – 40. Before embarking on an explanation of why the District Court correctly rejected Sompo's "*Royal & Sun* argument", the Railroads believe that a discussion of the operative facts in *Kirby* is necessary in order to understand the District Court's application of that precedent to the facts of this case.

In *Kirby,* the plaintiff hired International Cargo Control ("ICC"), a freight forwarder, to arrange for the transportation of its freight from Australia to Alabama. ICC issued a bill of lading to the plaintiff ("ICC Bill of Lading"). The ICC Bill of Lading contained a limitation of liability of $500 per package for the

48

ocean leg of the movement (Australia to the port at Savannah, Georgia) and a

higher limitation of liability for the land leg (Savannah to Huntsville, Alabama).

Under the $500 per package limitation, plaintiff's damages would have been

limited to $5,000.  For those carriers involved in the "land leg" of the freight

movement, the shipper would have been entitled to damages ranging from

approximately $9800 to $17,000. *Kirby*, 543 U.S. at 20, note 1.  ICC hired

Hamburg Sud ("Hamburg"), a German shipping company, to actually transport the

freight to the port at Savannah.  Hamburg issued a bill of lading to ICC that

contained a limitation of liability of $500 per package ("Hamburg Bill of Lading").

Hamburg then hired Norfolk Southern to transport the freight by rail from

Savannah to Huntsville.  The train derailed while en route causing damage to the

plaintiff's freight.  The question presented to the Court was whether the liability

limitation provisions contained in the ICC Bill of Lading and the Hamburg Bill of

Lading extended to Norfolk Southern.

The Supreme Court found that both the ICC Bill of Lading and the Hamburg

Bill of Lading contained valid "Himalya Clauses."  A "Himalaya Clause" is a

contractual provision in a bill of lading that extends the bill's liability limitations to

downstream parties contracted by the carrier to assist in the carriage of goods.

*Kirby*, 543 U.S. at 20 & n. 2.  The Supreme Court ultimately held that Norfolk

Southern was entitled to the liability limitation provisions contained in ***both*** bills of

lading. *Kirby,* 543 U.S. at 36 (emphasis added). It did not matter that the liability limitations differed from one another in that one was more beneficial to Norfolk Southern than the other.

Here, Unisia's freight moved under both the Nippon Express and the Yang Ming Bills of Lading. The District Court found (and the parties did not dispute) that both the Nippon Express Bill of Lading and the Yang Ming Bill of Lading contained valid Himalaya Clauses that extended the liability limitations contained therein to "downstream carriers" such as the Railroads. (SPA49). And Sompo does not challenge that finding in this appeal.

The District Court also found that covenants not to sue are effectively limitations of liability. (SPA49 & SPA59). Although Sompo contests that finding on the ground that the covenants not to sue are really exoneration clauses, the District Court correctly rejected – and this Court should reject – Sompo's "exoneration clause argument" for the reasons previously discussed. Because "[t]he facts in these cases are indistinguishable from the facts in *Kirby*" (SPA58), the District Court held that, with respect to the Unisia Shipment, the Railroads could enforce the covenant not to sue contained in the Yang Ming Bill of Lading, notwithstanding any ambiguity in the Nippon Express Bill of Lading. (SPA60).

Sompo argues that the court's analysis in *Royal & Sun* reflects the "correct" application of *Kirby*. Sompo's Opening Brief at 39. The District Court rejected

Sompo's reliance on *Royal & Sun,* because it found that the *Royal & Sun* court incorrectly "distinguished covenants not to sue from liability limitations." (SPA 62 at note 2).

The *Royal & Sun* analysis is also flawed in that it limits the holding in *Kirby* "only to accepting package limitations." *Royal & Sun,* 572 F. Supp. 2d at 398. *Kirby* has no such limitation. The *Kirby* decision rests, in part, on principles of limited agency. *Kirby*, 543 U.S. at 33-34. The carrier which issued the bill of lading directly to the shipper acts as an intermediary "when [it] contracts with subsequent carriers *for limitation on liability*." *Id.* at 34 (emphasis added). And that intermediary binds the shipper "to the liability limitation it negotiates with downstream carriers." *Id.* The Supreme Court could not have been clearer when it stated that, "here we hold that intermediaries, entrusted with goods, are 'agents' *only in their ability to contract for liability limitations* with carriers downstream." *Id.* (emphasis added). *Kirby* applies to "liability limitations" in general, and not to just "package limitations."

When Nippon Express contracted with Yang Ming to perform the ocean carriage of Unisia's freight, Nippon Express was acting as Sompo's insured's intermediary with authority to contract for liability limitations with downstream carriers. *Kirby* confirms that Nippon Express had the authority to enter into such

contracts thereby binding Sompo's insured to liability limitations imposed by downstream carriers such as, in this case, Yang Ming.

In *Kirby,* the Supreme Court fashioned a rule that "tracks industry practices", that would not "interfere with statutory and decisional law promoting nondiscrimination in common carriage," that would not "undermine COGSA's liability regime," and that is "equitable." *Kirby,* 543 U.S. at 34-35 (citations omitted). This Court should follow that rule and affirm the District Court's decision to enforce the covenant not to sue in the Yang Ming Bill of Lading against Sompo with respect to the Unisia Shipment.

### C. <u>Recovery of Damages for the Unisia Shipment is Limited to $37,000.</u>

Sompo suggests that, if this Court were to enter judgment in its favor, the $500 per package limitation from the U.S. Carriage of Goods by Sea Act would determine the amount of damages owed by the Railroads. Sompo's Opening Brief at 53. Sompo accurately calculates the amount it could recover for the Kubota Shipment, i.e., $23,000 for 46 tractors, each of which is a "package." Sompo's calculation of the amount recoverable for the Unisia Shipment is, however, incorrect. For the reasons discussed more fully below, application of the Package Limitation to the Unisia Shipment would result in a damage calculation of $37,000.

### 1.  **Relevant Facts**

Nippon Express issued a bill of lading to Hitachi, Ltd., for the transport of four containers of auto parts for shipment from Hitachi's plant in Japan to Unisia of Georgia, Corporation in Georgia.  (A183).  The Unisia Bill of Lading indicates that Unisia's freight consisted of "cartons" that had been packed either into "steel crates" or onto "pallets."  According to the bill of lading, there were 74 pallets and 103 steel crates, or "177 packages" that had been packed into the four containers. The freight shipped in two of the four containers, nos. TEXU 7204601 ("TEXU Container") and YMLU 4455172 ("YMLU Container"), is the Unisia freight at issue in this lawsuit.  (A29).

Hitachi, the shipper, had loaded 1845 cartons of freight into the TEXU Container, packing 705 of those cartons into 20 steel crates and 1,140 cartons onto 19 pallets.  Yang Ming's Container Load Plan, ("TEXU Load Plan"; D.E.. 52-9, at p. 1 of 2).   The TEXU Load Plan states that there were "39 PACKAGES", which is the sum of the 20 steel crates and the 19 pallets, packed into the TEXU Container.

Hitachi had loaded 2160 cartons of freight into the YMLU Container, packing 1,080 cartons into 27 steel crates and 1,080 cartons onto 18 pallets.  Yang Ming's Container Load Plan ("YMLU Load Plan"; D.E.. 52-9, at p. 2 of 2).  The

YMLU Load Plan states there were "45 PACKAGES", which is the sum of the 27 steel crates and the 18 pallets, packed into the YMLU Container.

Hitachi prepared the Unisia freight for shipment according to Hitachi's written packaging specifications at its "Atsugi plant" located in Japan. Deposition of Yukio Hoover ("Hoover Transcript"), at 9:20 – 11:13 and 14: 5 – 16: 7; (A463 – A465). Hitachi's specifications set forth the procedures to be used when loading the cartons into steel crates and onto pallets. *Id.* The loading of the freight into cartons and the loading of the cartons into steel crates and onto pallets all occurs at Hitachi's plant and is done to facilitate transport of the product contained within the cartons. *Id.*

### 2. **Applicable Law**

Sompo argues that there were 4,005 "packages" in the two containers making up the Unisia shipment, and that the Package Limitation, when applied to the Unisia shipment would result in damages in the amount of $2,002,500, which exceeds the actual value of the freight, which is $335,924. Sompo's Opening Brief at 53 – 54. Sompo contends that it is, therefore, entitled to the freight's actual value. Plaintiffs' argument, however, is contrary to long-standing precedent of the United States Court of Appeals for the Second Circuit. That precedent requires a

finding that the Unisia shipment consisted of 74 "packages" and, therefore, the Package Limitation damages for that shipment would be $37,000.

In *Standard Electrica, S.A., v. Hamburg Sudamericanische,* 375 F.2d 943 (2d Cir. 1967), this Court held that 1680 television tuners, packed into 54 cardboard cartons, which were loaded onto 9 pallets, were shipped in 9 "packages" for purposes of the COGSA package limitation.

A year after the *Standard Electrica* decision, this Court addressed the meaning of "package" with respect to the COGSA package limitation in *Aluminios Pozuelo, Ltd., v. SS. Navigator, et al.,* 407 F.2d 152, 155 (2d Cir. 1968). The Court said that,

> [t]he meaning of "package"…can therefore be said to define a class of cargo, irrespective of size, shape or weight, to which some packaging preparation for transportation has been made which facilitates handling, but which does not necessarily conceal or completely enclose the goods.

*Id. See Allied Int'l American Eagle Trading Corp., v. S.S. Yang Ming, et al.,* 672 F.2d 1055 (2d Cir. 1982) (nine cartons that had been loaded onto one pallet and ten drums that had been loaded onto a second pallet constituted two "packages" for purposes of the COGSA package limitations); *see also, Groupe Chegaray v. De Chalus., v. P & O Containers,* 251 F.3d 1359, 1368 (11th Cir. 2001) (2,270 shoebox-sized cartons of cosmetics loaded onto 42 pallets constituted 42 "packages" for COGSA package limitations).

In *Binladen BSB Landscaping, v. M.V. Nedlloyd Rotterdam,* 759 F.2d 1006, (2d Cir. 1985), this Court stated that the contractual agreement between the parties "is the touchstone of our analysis", noting that "[e]ntries on the bill of lading are thus important evidence of the intent of the parties to the shipping contract." *Id.* at 1012 (citations omitted).

### 3.  The Unisia Shipment Involved 74 Packages.

The Unisia Bill of Lading explicitly identifies 74 pallets and 103 steel crates for a total of 177 "packages."  The loading plan for the YMLU Container identifies 27 steel crates and 12 pallets for a total of 45 "packages."  The loading plan for the TEXU Container identifies 20 steel crates and 19 pallets for a total of 39 "packages."  As reflected in the shipping documents, the two shipping companies – Nippon Express and Yang Ming – understood "packages" to mean the pallets and steel crates that Hitachi was using to ship its freight.

Moreover, Ms. Hoover testified that Hitachi's use of pallets and steel crates was included in Hitachi's written packaging specifications.  She confirmed that the placement of the individual cartons onto pallets and into steel crates was done at the Hitachi factory pursuant to those specifications.  She also testified that the steel crates that Hitachi used to ship Hitachi's freight "go back and forth", i.e., they are used multiple times for freight shipments.

The pallets and steel crates used by Hitachi fall squarely within the Second Circuit's definition of a "package" for COGSA purposes. Hitachi used pallets and steel crates to facilitate the handling and transportation of its freight. The use of pallets and steel crates does not "necessarily conceal or completely enclose the goods." Moreover, the Nippon Express bill of lading to which Hitachi and Unisia were both parties, unambiguously identify the pallets and the steel crates as "packages." Finally, Yang Ming certainly understood that the pallets and steel crates were "packages" as evidenced by the loading plans for each of the containers.

Sompo's Package Limitation damages for the Unisia Shipment must be calculated by multiplying the number of packages (74) times $500. Accordingly, $37,000 is the maximum recoverable by Sompo for the Unisia Shipment.

## VI.   **CONCLUSION**

The District Court's consideration of the Railroads' defense based on a contractual covenant not to sue was well within the scope of this Court's remand order. The Railroads did not waive that contractual defense at any time during the pendency of this case, either at the District Court level or while this case was on appeal in this Court.

The District Court correctly held that the Railroads could enforce the covenant not to sue in the Yang Ming Bill of Lading against Sompo for the claims arising from the Kubota and Unisia Shipments.

Accordingly, this Court should affirm the District Court's entry of judgment in favor of Norfolk Southern Railway Company and Kansas City Southern Railway Company and against Sompo Japan Insurance Company of America, Inc., on the freight claims arising from the Kubota and Unisia Shipments.

Respectfully submitted,

**KEENAN COHEN & HOWARD P.C.**

By:   /s/ Paul D. Keenan
       Paul D. Keenan
       165 Township Line Road
       One Pitcairn Place, Suite 2400
       Jenkintown, PA 19046
       Phone: (215) 609-1110
       Fax: (215) 609-1117
       E-Mail: pkeenan@freightlaw.net

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, the foregoing brief is in 14-Point Times Roman proportional font and contains  13,751 words and thus is in compliance with the type-volume limitation set forth in Rule 32(a)(8)(B) of the Federal Rules of Appellate Procedure.

By:   /s/ Paul D. Keenan
Paul D. Keenan

Dated February 12, 2014